287 Md. 38 (1980)
410 A.2d 1060
WASHINGTON NATIONAL ARENA LIMITED PARTNERSHIP ET AL.
v.
TREASURER, PRINCE GEORGE'S COUNTY, MARYLAND
[No. 124, September Term, 1978.]
Court of Appeals of Maryland.
Decided February 7, 1980.
Certiorari denied October 6, 1980.
*39 The cause was argued before MURPHY, C.J., and SMITH, DIGGES, ELDRIDGE, ORTH,[*] COLE and DAVIDSON, JJ.
John J. Sellinger, with whom were Fossett & Brugger on the brief, for Alan I. Kay et al., part of appellants. Glenn T. Harrell, Jr., with whom were O'Malley, Miles, Farrington & McCarthy on the brief, for Washington National Arena Limited Partnership et al., other appellants.
David S. Bliden, Associate County Attorney, with whom were Robert B. Ostrom, County Attorney, and Michael O. Connaughton, Deputy County Attorney on the brief, for appellee.
Certiorari denied, Supreme Court of the United States, October 6, 1980.
ELDRIDGE, J., delivered the opinion of the Court.
This case represents the final chapter, we trust, in a long controversy between the government of Prince George's County and certain taxpayers over the proper rate of recordation taxes in Prince George's County. The specific issue before us is whether the retroactive application of a 1976 recordation tax statute would impair constitutionally protected rights.

*40 I.
The dispute had its origins in 1968 when the General Assembly amended Maryland Code (1957, 1975 Repl. Vol.), Art. 81, § 277, relating to the tax imposed upon the recordation of certain written instruments. Subsection (b) of § 277 provided in 1968, and continues to provide, that the basic rate of recordation taxes throughout the State would be $0.55 for each $500.00 of the consideration paid or, in the case of an instrument securing a debt, $0.55 for each $500.00 of the principal amount of the debt secured. The Legislature in 1968 enacted a new subsection (q) of § 277 which in substance stated that the counties and Baltimore City could, by resolution or ordinance, fix a recordation tax rate in lieu of the basic rate, but that in the absence of such resolution or ordinance, the rate specified in § 277 would continue to apply. Also in 1968, the Legislature added a new subsection (r) to § 277. Subsection (r), applicable only to Prince George's County, provided that "[n]otwithstanding the other provisions of this section," Prince George's County could by resolution adopt, in lieu of the basic recordation tax rate specified in subsection (b), a rate of $1.10 for each $500.00 of consideration or secured debt.
In 1968, soon after subsection (r) was enacted into law, the County Commissioners of Prince George's County by resolution set the recordation tax rate at $1.10. A few months later, however, in September 1968, the Prince George's County Commissioners adopted a new resolution increasing the recordation tax rate to $1.65.
The question of the proper recordation tax rate in Prince George's County first came before us in Prince George's Co. v. White, 275 Md. 314, 340 A.2d 236 (1975) (hereinafter referred to as White I). The taxpayers in that case had recorded deeds of trust among the Prince George's County land records in 1971 and 1972, and they were required to pay recordation taxes computed at a rate of $1.65 for each $500.00 of debt secured. The taxpayers then filed a claim for a partial refund of the recordation taxes pursuant to Art. 81, §§ 214-217. The Maryland Tax Court, the administrative agency empowered to render a final administrative decision *41 in the matter, held that the legal rate for recordation taxes in Prince George's County was $1.10 for each $500.00 of debt secured and that, therefore, the taxpayers were entitled to a partial refund representing the difference between the taxes actually paid at the $1.65 rate and the amount of taxes which should have been paid based upon the proper rate of $1.10. This Court in White I affirmed the Tax Court, holding that the Legislature intended the $1.10 rate, specified in subsection (r), to be the applicable rate in Prince George's County.
The subject of recordation taxes under Art. 81, § 277, next came before us in Blumenthal v. Clerk of Cir. Ct., 278 Md. 398, 365 A.2d 279 (1976). There this Court held that Baltimore City and certain counties, not including Prince George's County, were authorized by subsection (q) of § 277 to set whatever recordation tax rates those subdivisions deemed appropriate. We pointed out that subsection (r), limiting the rate to $1.10, was applicable just in Prince George's County, and we reiterated our holding in White I that the Legislature intended for subsection (r) to take precedence over the general authority granted counties by subsection (q). Blumenthal v. Clerk of Cir. Ct., supra, 278 Md. at 407.
The year following this Court's decision in White I, two statutes amending Art. 81, § 277, were enacted. Chapter 142 of the Acts of 1976, inter alia, amended subsections (q) and (r) to provide that all of the counties could by resolution or ordinance fix whatever recordation tax rate they desired, and that, in the absence of such resolution or ordinance, the recordation tax rate in Prince George's County should be $1.65 for each $500.00 of consideration or secured debt. Chapter 142, enacted as an emergency law and taking effect on April 13, 1976, was entirely prospective in its operation.
The other 1976 statute which amended Art. 81, § 277, was Ch. 129 of the Acts of 1976. It is Ch. 129 which gives rise to the retroactivity issue presented in the instant case. Section 1 of Ch. 129 stated the "legislative intent" that, from and after July 1, 1968, the recordation tax rate prescribed by a county resolution or ordinance superseded the tax rates set forth in any subsection of § 277. Section 2, in the first *42 paragraph, purportedly "ratified, confirmed, and validated" the "authority to collect recordation taxes pursuant to a tax rate fixed" by resolution or ordinance of a subdivision on or after July 1, 1968. The second paragraph of § 2 provided that the statute did not apply to "actions which are res judicata, nor whenever constitutionally protected rights would be impaired."[1]
The matter of the Prince George's County recordation tax rate, in light of the provisions of Ch. 129 of the Acts of 1976, was before us in White v. Prince George's County, 282 Md. 641, 387 A.2d 260 (1978) (hereinafter cited as White II). White II involved two categories of recordation tax refund claims. One category consisted of claims which had never been presented to the Maryland Tax Court, and we refused to consider the merits of those claims because of the taxpayers' failure to exhaust their administrative remedies. The other category of recordation tax refund claims before us in White II consisted of the identical claims involved in White I, as to which the taxpayers had, of course, exhausted administrative remedies. In spite of our decision in White I that the taxpayers in that case were entitled to refunds, Prince George's County had refused to refund the money. The County initially argued that we should reconsider our prior interpretation of the recordation tax provisions. *43 Alternatively, the County argued that Ch. 129 of the Acts of 1976 had the effect of retroactively increasing the recordation tax rate in Prince George's County to $1.65, so that the $1.65 rate was applicable to the White I claims involving 1971 and 1972 taxes. It was the County's contention that the White I claims were not excepted from the operation of Ch. 129 by the second paragraph of § 2, because the White I litigation was not res judicata and because constitutionally protected rights were not impaired. In White II, we rejected both arguments by Prince George's County. First (282 Md. at 657), we refused to depart from the interpretation of Art. 81, § 277 (q) and (r), which we rendered in White I and reaffirmed in Blumenthal v. Clerk of Cir. Ct., supra. Second (id. at 658-659), we held that the White I proceedings were res judicata and that, therefore, the White I claims were excepted from the operation of Ch. 129. Because of our ruling with regard to res judicata, it was unnecessary for us in White II to decide whether constitutionally protected rights would also have been impaired. That issue must now be resolved in the case at bar.

II.
The relevant facts of this case are undisputed and may be briefly stated. The petitioners are several corporations and partnerships which, at various times prior to 1976, recorded written instruments among the Prince George's County land records and were required to pay recordation taxes based upon the $1.65 rate. They all filed timely claims for partial refunds which, because of the County's failure to act upon them within six months, were disallowed by operation of law.[2]
Petitioners all took timely appeals to the Maryland Tax Court, and, by that time, Ch. 129 of the Acts of 1976 had been *44 enacted into law. The Maryland Tax Court viewed Ch. 129 as "a curative act" which "resurrected the [1968] resolution adopted by the County Commissioners of Prince George's County fixing the recordation tax rate at $1.65 per $500.00." The Tax Court held that, as a "curative act," Ch. 129 could be retroactively applied to petitioners without impairing constitutional rights.
Upon judicial review of the Tax Court's decision, the Circuit Court for Prince George's County affirmed on the ground that Ch. 129 of the Acts of 1976 was "curative" legislation, curing a prior defect in Prince George's County's authority to collect recordation taxes at the rate of $1.65, and, as such, its retroactive application to the taxpayers in this case did not impair constitutionally protected rights. The taxpayers took an appeal to the Court of Special Appeals. Before any further proceedings in that intermediate appellate court, the taxpayers filed a petition for a writ of certiorari which we granted.

III.
The issue in this case could be viewed either as one of statutory interpretation or as a matter of constitutionality. It makes no practical difference whichever way it is viewed. The Legislature, in Ch. 129 of the Acts of 1976, expressly stated its intention that the statute should not apply "whenever constitutionally protected rights would be impaired." Consequently, from a technical viewpoint, if the retroactive application of the 1976 tax statute to the recordation of written instruments at various times between September 1968 and 1976 would impair taxpayers' constitutional rights, then, as a matter of legislative intent, the statute does not apply. However, in order to determine the application of Ch. 129 on this statutory interpretation ground, it is obviously necessary to resolve the constitutional question.
In this Court, Prince George's County defends the constitutionality of applying Ch. 129 of the Acts of 1976 to recordation before 1976 solely on the ground that the Act, *45 as so applied, represents permissible "curative" legislation. The County does not contend, apart from the statute's being "curative," that the Legislature could, consistent with constitutional limitations, in 1976 retroactively increase the tax on recording transactions which were completed as long ago as 1968. Considering the degree of retroactivity and the nature of the transactions here being taxed, we agree that if the application of Ch. 129 to recording transactions between 1968 and 1976 can be sustained, it must be on the ground that the act is valid "curative" legislation.[3]
It is often said that "curative acts," although retroactive, are generally upheld on the ground that whatever a legislative body "may authorize in prospect, it may adopt and validate in retrospect, so long as there is no interference with vested rights or contractual obligations." (Emphasis supplied.) Co. Council v. Carl M. Freeman Assoc., 281 Md. 70, *46 79, 376 A.2d 860 (1977); Dryfoos v. Hostetter, 268 Md. 396, 404, 302 A.2d 28, 32-33 (1973). The problem, frequently, is in determining whether there is an "interference with vested rights or contractual obligations."[4]
With respect to legislation imposing taxes or other governmental charges, which is retroactive to prior years, and which purports to correct defects in the collecting authority for those prior years, the line between permissible "curative" legislation and unconstitutionally retroactive legislation has been somewhat difficult to draw.[5] The two leading Supreme Court cases which illustrate each side of that line are United States v. Heinszen, 206 U.S. 370, 27 S.Ct. 742, 51 L.Ed. 1098 (1907), and Forbes Pioneer Boat Line v. Board of Commissioners, 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647 (1922).
The facts in Heinszen were as follows. In November 1898, after the Philippine Islands came under the military control of the United States, a tariff on goods coming into the Philippines went into effect pursuant to an order of the President as Commander in Chief. The treaty of peace ending the Spanish-American War was ratified in April 1899, and collections went on under the same tariff. In April 1900, a governing commission was appointed by the President, and the same tariff continued in effect. Then, in March 1902, an Act of Congress continued the original tariff in force. In a series of cases between that time and 1906, dealing with *47 Puerto Rico and the Philippine Islands, the Supreme Court held that the President, as Commander in Chief, had authority to impose the tariff until the treaty of peace was ratified but that, after ratification, the authority had to come from Congress. Consequently, between 1898 and April 1899, when the treaty was ratified, the tariff duties were properly collected, and after March 1902, when Congress acted, they were properly collected. But there was a hiatus in the authority to collect the duties under the tariff between April 1899 and March 1902. Congress responded to this problem in June 1906 by enacting a statute which "legalized and ratified ... the collection of all such duties" during the gap in authority prior to March 1902.
The issue in United States v. Heinszen, supra, was the constitutional validity of the June 1906 statute ratifying the collection of duties under the tariff pursuant to the presidential order. The Court of Claims had refused to give effect to the Act, and the government appealed. The Supreme Court, in an opinion by Mr. Justice White on behalf of a five-judge majority, reversed, applying the principle that a legislative body may
"`cure irregularities, and confirm proceedings which without the confirmation would be void, because unauthorized, provided such confirmation does not interfere with intervening rights.'" (206 U.S. at 384, quoting from Mattingly v. District of Columbia, 97 U.S. 687, 690, 24 L.Ed. 1098 (1878)).
With regard to the argument that the 1906 Act amounted to a retroactive imposition of tariff duties, the majority opinion relied upon the "fact that when the goods were brought into the Philippine Islands there was a tariff in existence under which duties were exacted in the name of the United States." Id. at 385. The Court also held that it made no difference that the appellee taxpayers' action for a refund was pending when the "curative act" was enacted, id. at 387.
Forbes Pioneer Boat Line v. Board of Com'rs, supra, was decided by the Supreme Court sixteen years after Heinszen. Forbes involved the collection of tolls at a canal built and *48 operated by the State of Florida.[6] The Board of Commissioners, being the public agency charged with maintaining the canal as part of the Everglades drainage district, and acting under what it viewed as a broad grant of statutory authority, collected tolls for passage from the Forbes Pioneer Boat Line. The boat line in 1917 filed suit for a refund. The Supreme Court of Florida, based on its interpretation of the statutory provisions (see 82 So. at 347-351), held that the Board of Commissioners was not empowered to collect tolls for passage through the canal. On the same day in 1919 as the Florida Supreme Court's decision, the State Legislature passed a statute providing that "`all tolls heretofore collected ... [are] legalized and validated.'" (86 So. at 201.)
The Florida Supreme Court in Forbes upheld the validity of the ratification statute, relying on United States v. Heinszen, supra. The Supreme Court of the United States, however, in a unanimous opinion written by Mr. Justice Holmes, reversed, holding the statute to be an infringement of constitutionally protected property rights. The Court explained (258 U.S. at 339):
"Stripped of conciliatory phrases the question is whether a state legislature can take away from a private party a right to recover money that is due when the act is passed. The argument that prevailed below was based on the supposed analogy of United States v. Heinszen & Co., 206 U.S. 370, ... which held that Congress could ratify the collection of a tax that had been made without authority of law. That analogy, however, fails. A tax may be imposed in respect of past benefits, so that if instead of calling it a ratification Congress had purported to impose the tax for the first time the enactment would have been within its power. Wagner v. Baltimore, 239 U.S. 207, 216, 217. Stockdale v. Atlantic Insurance Co., 20 Wall. 323. But generally ratification of an act is not *49 good if attempted at a time when the ratifying authority could not lawfully do the act. Bird v. Brown, 4 Exch. 786, 799. If we apply that principle this statute is invalid. For if the Legislature of Florida had attempted to make the plaintiff pay in 1919 for passages through the lock of a canal, that took place before 1917, without any promise of reward, there is nothing in the case as it stands to indicate that it could have done so any more effectively than it could have made a man pay a baker for a gratuitous deposit of rolls."
The Court went on to acknowledge that some of the ratification cases had gone beyond the principles set forth above, but the opinion made it clear that such extension cannot "go very far" in order to be upheld (id. at 339-340):
"It is true that the doctrine of ratification has been carried somewhat beyond the point that we indicate, in regard to acts done in the name of the Government by those who assume to represent it.... [Citations omitted.] It is true also that when rights are asserted on the ground of some slight technical defect or contrary to some strongly prevailing view of justice, Courts have allowed them to be defeated by subsequent legislation and have used various circumlocutions, some of which are collected in Danforth v. Groton Water Co., 178 Mass. 472, 477. Dunbar v. Boston & Providence R.R. Co., 181 Mass. 383, 385. In those cases it is suggested that the meaning simply is that constitutional principles must leave some play to the joints of the machine.
"But Courts can not go very far against the literal meaning and plain intent of a constitutional text. .. ."
The Supreme Court then pointed out that, in light of the decision of the Florida court below interpreting the Commissioners' statutory authority, the "transaction was not one for which payment naturally could have been expected." *50 (Id. at 340.) The Court concluded by stating that because the Legislature omitted to authorize imposition of the tolls earlier constituted no valid basis for later permitting the Legislature to deprive the plaintiff of its right to a refund (ibid.).
There are several points of similarity between Heinszen and Forbes. In both cases, governmental officials charged with administering a program collected certain charges believing that they were so authorized. In both there existed some color of authority for the administrative action, i.e., in Heinszen the tariff promulgated pursuant to presidential order, and in Forbes the statute setting forth the Commissioners' powers, as interpreted by the Commissioners. In both cases there were subsequent court decisions holding that the collections were unauthorized, that the "color of authority" relied upon did not empower the government officials to make the collections, and that the payors were entitled to refunds. Finally, in both cases the appropriate legislative bodies, as a result of the litigation, enacted retroactive statutes purporting to "legalize" the prior unauthorized collections.
There is, on the other hand, one major area of difference between Heinszen and Forbes. The unauthorized action of the tax collectors in Heinszen did not violate a controlling statute setting forth the applicable policy, whereas in Forbes, there were legislative enactments setting forth the authority of the Commissioners which, as interpreted by the courts, the Commissioners were violating. In other words, in Heinszen there never was an expression of legislative policy contrary to the unauthorized action of the administrative officials. Instead, the actions of the appropriate policy makers (first the President as Commander in Chief and then the Congress) were entirely consistent with the actions of the Philippine commissioners and the tax collectors. For a reason unrelated to a policy determination concerning the appropriate tariff, there was a hiatus in the authority of the tax collectors. In this sense, Heinszen involved the type of defect in authority which is often referred to as a "technical" one. The Commissioners in Forbes, however, were, at the time of the toll collections, violating the legislative policy as ascertained *51 by the courts. In Forbes, the defect in authority was in no sense "technical" but related to the legislative policy determination of what, if anything, should be charged by the government. The fact that the Legislature later expressed a different intent, and by "curative act" language attempted to indicate that its new position had been the policy all along, did not convert the change in policy to a ratification of a "technical" defect.
We do not suggest that this distinction between Heinszen and Forbes can always, like a mathematical formula, determine whether a purported "curative act" should be upheld. Other factors, such as whether the retrospective application of the statute works substantial injustice, whether the retroactive act was anticipated at the time of the transaction, the nature of the "colorable authority" under which the governmental officials were acting, whether the defect in authority at the time of the collections was inadvertent, whether or not the "repairs" made by the ratification statute were "small," etc., all may have a role. See, e.g., the discussions in Hochman, The Supreme Court And The Constitutionality Of Retroactive Legislation, 73 Harv. L. Rev. 692, 703-706 (1960); Novick and Petersberger, Retroactivity In Federal Taxation, 37 Taxes 407, 416-418 (1959); Slawson, Constitutional and Legislative Considerations in Retroactive Lawmaking, 48 Cal. L. Rev. 216, 238-242 (1960). Nevertheless, the line drawn by the Heinszen and Forbes opinions, taken together, generally represents the limit of a legislature's power to enact "curative" statutes without impairing constitutionally protected rights.
Many other cases reflect the same distinction shown by Heinszen and Forbes, between ratifying defects in authority unrelated to the underlying policy and attempting retroactively to change legislative policy under the guise of "curative acts." For example, in Graham v. Goodcell, 282 U.S. 409, 51 S.Ct. 186, 75 L.Ed. 415 (1931), the Court upheld a retroactive statute rectifying a defect in the authority to collect a tax because of the running of limitations. The Supreme Court there emphasized that the retroactive statute *52 did not affect the amount of the tax which had been due (282 U.S. at 426):
"The tax was a valid one, and the fact that the taxpayers had been indebted to the Government for the amount which was subsequently collected is not now open to dispute. Delay in collection had followed upon the taxpayers' request for a consideration of their claim that the tax should be abated, and, in the mistaken belief on the part of the administrative authorities that the statute of limitations did not bar collection...."
The Court then discussed Forbes and Heinszen as the cases illustrating the general principles in this area, and it concluded that removing the bar of limitations was within the doctrine of the Heinszen case (id. at 427-429). Subsequently, in Paramino Lumber Co. v. Marshall, 309 U.S. 370, 378, 60 S.Ct. 600, 84 L.Ed. 814 (1940), a workmen's compensation case, the Court again upheld a retroactive statute curing a limitations problem, pointing out that the act "does not operate to create new obligations where none existed before. It is an act to cure a defect in administration developed in the handling of a compensable claim." See, e.g., Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 301-302, 57 S.Ct. 478, 81 L.Ed. 659 (1937); Tiaco v. Forbes, 228 U.S. 549, 33 S.Ct. 585, 57 L.Ed. 960 (1913); Sanitary Commission v. Noel, 155 Md. 427, 142 A. 634, appeal dismissed, 278 U.S. 573, 49 S.Ct. 94, 73 L.Ed. 513 (1928) (curing the procedural defect of a lack of notice). See also Ettor v. Tacoma, 228 U.S. 148, 33 S.Ct. 428, 57 L.Ed. 773 (1913) (invalidating a retroactive statute which clearly changed the legislative policy expressed in an earlier statute, as interpreted by the courts).
A Maryland case applying the above-discussed principles, and involving a situation quite similar to that in the instant case, is Comptroller v. Glenn L. Martin Co., 216 Md. 235, 140 A.2d 288, cert. denied, 358 U.S. 820, 79 S.Ct. 34, 3 L.Ed.2d 62 (1958). In Martin, the plaintiff company filed a refund claim for sales and use taxes paid from March 1, 1951, through April 30, 1954. Martin had claimed that under the terms of *53 its contracts with the Navy and Air Force the tangible personal property in dispute  tools and equipment  was to be resold to the United States and therefore did not constitute taxable property within the meaning of the Sales and Use Tax statutes then in force. In two earlier cases, Baltimore Foundry & Machinery Corp. v. Comptroller, 211 Md. 316, 127 A.2d 368 (1956), and Comptroller v. Aerial Products, Inc., 210 Md. 627, 124 A.2d 805 (1956), presenting similar facts, this Court had construed the Sales and Use Tax Acts so as to exclude from taxation personal property such as that involved in Martin. At the next session of the Legislature after the decisions in Baltimore Foundry and Aerial Products, Ch. 3 of the Acts of 1957 was enacted as an emergency measure, taking effect on January 28, 1957. That statute, being a direct consequence of the Aerial Products and Baltimore Foundry decisions, amended the Sales and Use Tax Acts retroactively as of July 1, 1947, to bring about an opposite result and tax personal property of the type involved in those cases. The Act recited that the "uniform administrative interpretation and enforcement by the Comptroller" since 1947 had been in accord with what had "always been the intent of the General Assembly." The statute amended the Sales and Use Tax Acts effective July 1, 1947, so as to cover the property in question.
This Court in Martin, relying principally upon Forbes Pioneer Boat Line v. Board of Com'rs, supra, held that the retroactive application of Ch. 3 of the Acts of 1957 was in violation of the Fourteenth Amendment and the Maryland Declaration of Rights. After discussing in detail Heinszen, Forbes and other "ratification" cases, Chief Judge Brune for the Court stated that if Ch. 3 were treated as an attempted "curative act," then "under the Forbes Pioneer Boat Line case the application of the doctrine of ratification would not be supportable." 216 Md. at 249. The Court concluded that the reasoning of Mr. Justice Holmes in Forbes was "applicable in the instant case" and that the statute "seeks to place a tax where none was imposed before and to reach transactions completed long before its enactment." Id. at 257-258.
Turning to the case at bar, we do not believe that it can be *54 meaningfully distinguished from Forbes and Martin. Chapter 129 of the Acts of 1976 did not rectify a "technical" defect in the authority of the Prince George's County Commissioners and the tax collectors to collect recordation taxes at the $1.65 rate. Prior to Ch. 129, the maximum recordation tax rate in Prince George's County was $1.10. Article 81, § 277 (r), in clear language, authorized the Prince George's County Commissioners to set the $1.10 rate in lieu of the basic $0.55 rate; it did not authorize a rate of $1.65. This was the legislative policy, as interpreted by this Court in White I, in effect at the time the petitioners' taxable transactions were completed, and in effect at the time petitioners filed their claims for refunds. The actions of the officials in Prince George's County, requiring payment at the $1.65 rate, was wholly inconsistent with the policy set forth in the controlling State statute, as construed by this Court. This case, therefore, involves the same type of situation presented in Forbes and Martin. Unlike Heinszen and similar cases upholding "curative acts," in the present case when the petitioners filed refund claims, they were not entitled to the refunds on the ground of "technical" or procedural defects in the authority of government officials. Instead, like the claimants in Forbes and Martin, the petitioners were then entitled to refunds because of the legislative policy embodied in Art. 81, § 277 (r), that the tax rate ought to be $1.10.
Furthermore, as in Forbes and Martin, the fact that the Legislature in Ch. 129 couched the language in "curative" terms, and recited (contrary to the language of the prior statute) that its intent had always been the same, does not convert a retroactive policy change into a permissible ratification statute.[7] The presence of "curative" language, or a recital that the Legislature in the past really intended what is now being enacted into law, cannot render a statute immune from constitutional challenge on retroactivity grounds. If it did, any retroactive legislation could be shielded from a successful constitutional attack merely by the insertion of such language.
*55 To give Ch. 129 of the Acts of 1976 the retrospective application urged by Prince George's County would be to hold that a Legislature, after it set one rate of tax upon certain transactions, could then, as long as eight years after the taxable transactions were fully completed under the old rate, reach back and substantially increase that tax on those same transactions. We are aware of no case going so far.[8]
Consequently, the retroactive application of Ch. 129 of the Acts of 1976 to the petitioners' recording transactions would impair property rights in violation of the United States Constitution and the Maryland Declaration of Rights. In light of the statement of legislative intent in Ch. 129, that the Act is not to apply "whenever constitutionally protected rights would be impaired," we hold that Ch. 129 presents no bar to the petitioners' refund claims.
Judgment of the Circuit Court for Prince George's County reversed, and case remanded to that court for the entry of an order consistent with this opinion.
Respondent to pay costs.
NOTES
[*] Reporter's Note: Orth, J., participated in the hearing of the case and in the conference in regard to its decision but retired prior to the adoption of the opinion by the Court.
[1] The entire Ch. 129, except for the title and date of enactment clause, is as follows:

"SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the legislative intent with respect to subsection (q) of Section 277 of Article 81 of the Annotated Code of Maryland is that recordation tax rates fixed from time to time by resolution or ordinance of a county or Baltimore City and which are applicable on or after the date subsection (q) became effective, namely, July 1, 1968, supersede tax rates specified for that political subdivision in any other subsection of Section 277 as of July 1, 1968, or subsequent applicable date of the locally enacted tax rates.
"SECTION 2. AND BE IT FURTHER ENACTED, That authority to collect recordation taxes pursuant to a tax rate fixed from time to time by resolution or ordinance of a county or Baltimore City and applying on or after July 1, 1968, is hereby ratified, confirmed, and validated.
"This Section 2 of the Act is not intended to apply to relevant actions which are res judicata, nor whenever constitutionally protected rights would be impaired."
[2] Art. 81, § 217, provides in part that

"[i]f a claim for refund is neither allowed nor disallowed within 6 months from the date of filing of the claim, the claim may be deemed by the person filing it to have been finally disallowed and such person may file an appeal to the Maryland Tax Court under this section."
[3] Aside from the "curative" theory, the application of a 1976 retrospective tax statute to voluntary transactions fully completed as long ago as 1968, when the applicability of the 1976 statute would not be anticipated, could not be upheld under the federal and state constitutional provisions protecting property rights.

The Supreme Court and this Court have held that retroactive statutes, imposing taxes or other governmental charges and reaching voluntary transactions completed significantly before the enactment of the statutes, unconstitutionally deprive persons of property or contract rights. Coolidge v. Long, 282 U.S. 582, 51 S.Ct. 306, 75 L.Ed. 562 (1931); Untermyer v. Anderson, 276 U.S. 440, 48 S.Ct. 353, 72 L.Ed. 645 (1928); Nichols v. Coolidge, 274 U.S. 531, 47 S.Ct. 710, 71 L.Ed. 1184, 52 A.L.R. 1081 (1927); Forbes Pioneer Boat Line v. Board of Com'rs, 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647 (1922); Comptroller v. Glenn L. Martin Co., 216 Md. 235, 140 A.2d 288, cert. denied, 358 U.S. 820, 79 S.Ct. 34, 3 L.Ed.2d 62 (1958). See particularly the excellent discussions of the cases by Mr. Justice Stone for the Court in Milliken v. United States, 283 U.S. 15, 51 S.Ct. 324, 75 L.Ed. 809 (1931); by Chief Judge Brune for this Court in Comptroller v. Glenn L. Martin Co., supra; and by Judge Parke for this Court in Match Co. v. State Tax Comm., 175 Md. 234, 200 A. 365 (1938).
Generally, cases upholding the constitutionality of retroactive tax legislation have involved relatively short periods of unanticipated retroactivity; they have not involved periods even approaching the eight years in the present case. See, e.g., United States v. Hudson, 299 U.S. 498, 500-501, 57 S.Ct. 309, 81 L.Ed. 370 (1937) (retroactive period of 35 days), and cases there cited. The Supreme Court in Welch v. Henry, 305 U.S. 134, 59 S.Ct. 121, 83 L.Ed. 87 (1938), suggested that relevant circumstances to be considered in determining the constitutionality of retroactive taxation include the nature of the tax (305 U.S. at 147), whether the tax or tax increase could have been anticipated by the taxpayer at the time of the taxable transaction (ibid.), whether the taxable event was "voluntary" so that the taxpayer might have refrained from acting if he had anticipated the tax (ibid.), and how far in the past the tax attempted to reach (id. at 148).
[4] With regard to "vested rights," one commentator has pointed out (Hochman, The Supreme Court And The Constitutionality Of Retroactive Legislation, 73 Harv. L. Rev. 692, 696 (1960)):

"The traditional principle invoked in determining the constitutionality of retrospective legislation is that a statute may not abrogate `vested rights.' However, it has long been recognized that the term `vested right' is conclusory  a right is vested when it has been so far perfected that it cannot be taken away by statute."
[5] See, e.g., the discussions in Ballard, Retroactive Federal Taxation, 48 Harv. L. Rev. 592 (1935); Hochman. The Supreme Court And The Constitutionality Of Retroactive Legislation, supra, 73 Harv. L. Rev. at 703-711; Novick and Petersberger, Retroactivity In Federal Taxation, 37 Taxes 407, 416-419 (1959); Sekula, Retroactive Remedial Tax Legislation and the Statute of Limitations, 9 Duquesne L. Rev. 1, 37-39 (1970); Slawson, Constitutional and Legislative Considerations in Retroactive Lawmaking, 48 Cal. L. Rev. 216, 217-221, 238-242 (1960); Note, Setting Effective Dates For Tax Legislation: A Rule of Prospectivity, 84 Harv. L. Rev. 436, 440-442 (1970).
[6] In addition to the Supreme Court's opinion, many of the pertinent facts are set forth in Forbes Pioneer Boat Line v. Board of Com'rs, 77 Fla. 742, 82 So. 346 (1919), and Board of Com'rs v. Forbes Pioneer Boat Line, 80 Fla. 252, 86 So. 199 (1920).
[7] We have pointed out that a statement by present members of a legislative body, as to what their predecessors intended in a statute enacted several years previously, is not entitled to much weight. Collier v. Connolley, 285 Md. 123, 126, 400 A.2d 1107 (1979).
[8] Prince George's County relies upon National Can Corp. v. Tax Comm., 220 Md. 418, 153 A.2d 287 (1959), appeal dismissed, 361 U.S. 534, 80 S.Ct. 586, 4 L.Ed.2d 538 (1960). National Can upheld as permissible "curative" legislation a statute ratifying a certain administrative practice by tax assessors with regard to the method of arriving at "full cash value." However, that case does not support Prince George's County's position. What was before the Court in National Can was, as just mentioned, a practice regarding the method of assessment; the subjection of property to tax or the level of tax was not directly involved. Moreover, the administrative practice in National Can was not specifically dealt with by any prior statute, unlike the administrative action in the instant case which was directly inconsistent with the language of then Art. 81, § 277(r). The present case is obviously closer to Forbes and Martin than to National Can.