483 A.2d 1263

**VYTAR ASSOCIATES et al.**

v.

**The MAYOR AND ALDERMEN OF the CITY OF ANNAPOLIS.**

**No. 117, Sept. Term, 1983.**

Court of Appeals of Maryland.

Nov. 27, 1984.

Alan Chep, Annapolis (Hyatt, Chep & Winegrad, P.A., Annapolis, on the brief), for appellants.

Richard T. Wright, Annapolis (Frederick C. Sussman, City Atty., and Wright & Wright, P.A., Annapolis, on the brief), for appellees.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON,* RODOWSKY and COUCH, JJ., and W. AL-BERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

These are claims for refund of license fees voluntarily paid to a municipality under an ordinance later judicially invalidated for lack of municipal power. We must first determine whether the refund statute relied upon, Md.Code (1957, 1980 Repl.Vol.), Art. 81, § 215, authorizes refunds of license fees paid under the circumstances presented here. If it does, we must then decide the constitutionality of an attempt by the General Assembly retroactively to validate municipal imposition of the class of fees involved.

The Annapolis City Code (1969) (ACC) § 12–16 proscribes the operation of certain rental dwellings in the City of Annapolis without a license and establishes a license fee. Vytar Associates, Refuse Removers, Inc., and Hilltop Associates (Owners), each of which operated rental dwellings in the city, voluntarily paid, for several years, substantial fees to the Mayor and Aldermen of the City of Annapolis, a municipal corporation, (Annapolis) for operating licenses.

---

* Davidson, J., participated in the hearing of the case and in the conference in regard to its decision, but died prior to the adoption of the opinion by the Court.

Then this Court decided *Campbell v. City of Annapolis,* 289 Md. 300, 424 A.2d 738 (1981). We held that the license fee imposed by ACC § 12–16(f) was invalid under MD. Const. art. XI–E, § 5 because the fee had not been expressly authorized by the General Assembly. *Id.* at 311–12, 424 A.2d at 744. Whereupon each of Owners filed a claim with Annapolis for a refund of the license fees which it had paid. Then the General Assembly responded to *Campbell* by enacting two identical bills as emergency legislation. *See* Ch. 565 (S.B. 751) and Ch. 684 (H.B. 1292) of the Acts of 1981. Section 1 of this legislation, codified as Md.Code (1957, 1981 Repl.Vol., 1984 Cum.Supp.), Art. 23A, § 2(b)(32) and (33), expressly bestows upon an incorporated municipality the power which we had found in *Campbell* to be lacking, namely the right to charge a rental dwelling license fee. Section 2 of the emergency legislation, not codified, in terms ratifies previously imposed fees.

Annapolis disallowed the claims. Owners appealed to the Maryland Tax Court. The Maryland Tax Court held that "the refund claims should have been honored and paid." Annapolis noted an appeal to the Circuit Court for Anne Arundel County. The circuit court reversed the order of the Maryland Tax Court. This appeal by Owners followed on which we issued the writ of certiorari on our own motion prior to consideration of the case by the Court of Special Appeals.

Owners suggest that the threshold question is whether the Maryland Tax Court had jurisdiction to entertain the claims for refunds of the license fees. This question, however, is answered by a determination whether Owners were entitled to file claims with Annapolis for a refund of the fees which they paid. If they were so entitled, the Maryland Tax Court had jurisdiction to entertain an appeal in the event the claims were disallowed. We explain.

■ Owners "do not dispute that the common law rule in Maryland is that in the absence of some statutory provision authorizing it, taxes, fees or other governmental charges

voluntarily paid under a mistake of law cannot be recovered back. *Walk-A-Show, Inc. v. Stanton,* 182 Md. 405[, 35 A.2d 121] (1943)." *See White v. Prince George's County,* 282 Md. 641, 651–54, 387 A.2d 260, 266–67 (1978); *Rapley v. Montgomery County,* 261 Md. 98, 106–11, 274 A.2d 124, 128–31 (1971). The Maryland Legislature, however, has somewhat eased the plight of the harried taxpayer by creating over the years the present scheme for the refund in certain circumstances of ordinary and special taxes and of "other fees or charges." Md.Code (1957, 1980 Repl.Vol., 1984 Cum.Supp.), Art. 81, title "Revenue and Taxes," §§ 213–219 comprising the subtitle "Refund of Taxes." [1] *See White,* 282 Md. at 647–48, 387 A.2d at 264–65; *Rapley,* 261 Md. at 109–10, 274 A.2d at 130.

■ Within that subtitle, § 215, set forth *infra,* is the statute on which Owners rely for entitlement to refunds and to avoid the common law rule. They first made their claims at the municipal level (§ 216) and appealed to the Maryland Tax Court pursuant to § 217 from the "final action taken under the provisions of § 216 ... in disallowing [their] claim[s] for refund ...." Section 224 of Art. 81 bestows on the Maryland Tax Court "the powers and duties in [Art. 81] specified." Consequently if Owners had the right to claim a refund from Annapolis under § 215, the Maryland Tax Court, by § 217, had jurisdiction to entertain an appeal from a disallowance of the claim.[2]

---

1. Ordinary taxes are "[d]irect taxes imposed in respect of real or personal property." Art. 81, § 6. Special taxes "by necessary implication *include* all taxes imposed by Art. 81 other than direct taxes, whether specifically listed [in § 6] or not." *Latrobe Brewing Co. v. Comptroller of the Treasury,* 232 Md. 64, 70, 192 A.2d 101, 103 (1963) (emphasis added).

2. Despite the urging of Annapolis, we do not think that Md.Code (1957, 1982 Repl.Vol.), Art. 41, § 318 compels a contrary view. In *Montgomery County Council v. Supervisor of Assessments,* 275 Md. 339, 340 A.2d 302 (1975), we pointed out that it was "§ 224 of Art. 81, enacted as part of the same statute as § 318 of Art. 41, [which] provided that the powers of the Tax Court were those specified in Art. 81, the tax article." *Id.* at 348, 340 A.2d at 307. We believed that

The principal issue between the parties arises over the construction of § 215. In order to highlight the problem we present as separate paragraphs the three clauses of § 215 which describe when its refund authorization applies.

Whenever any person

■ shall have erroneously or mistakenly paid to any State, county or municipal agency authorized to collect the same more money for special taxes or other fees or charges, than was properly and legally payable, or

■ shall have paid any special taxes which were erroneously or illegally assessed or collected, or

■ penalties or interest thereon collected without authority, or in any other manner wrongfully collected, he may file with such agency a written claim for the refund thereof. Such agency shall investigate the merits of such claim, and the taxpayer filing the same shall be entitled to a hearing thereon before such agency. Such claim for refund shall be in such form[,] verified in such manner, contain such information and be supported by such documents as may be prescribed by the Comptroller, or the chief fiscal officer of the county or municipality, as the case may be, and shall be filed within three years from the date of the payment of the special taxes, fees, charges, penalties or interest for which refund is requested.

■ The parties agree that the monies Owners paid and seek to have refunded represent license fees and not special taxes.[3] Under the first clause a person is entitled to a

---

"[t]he language in § 318 referring to the jurisdiction of the Tax Court was ... descriptive only, setting forth the 'quasi-judicial' functions that had previously been exercised by the State Tax Commission." *Id.* We opined that the Legislature did not intend, "by the provisions of Art. 41, § 318, to expand [or restrict] the jurisdiction of the Tax Court beyond that described in the various provisions of Art. 81, the tax article of the code." *Id.* at 347, 340 A.2d at 307.

**3.** It seems that ACC § 12–16 goes to the regulation of rental dwellings by requiring a license to operate them and not to the raising of revenue by way of taxes. Subsection (a) flatly declares:

refund "[w]henever [he] shall have erroneously or mistakenly paid to any ... municipal agency authorized to collect the same more money for special taxes or other fees or charges, than was properly and legally payable ...." The disputed payments met these criteria. They fell into the category of "other fees or charges" as fees to obtain licenses to operate rental dwellings.[4] The fees were "erroneously or mistakenly paid" because the law establishing them was declared unconstitutional. They were paid to the agency designated by the Annapolis City Code to collect them. They were in an amount more than was "properly and legally payable" because in fact no fee at all was then "properly and legally payable." That is, the words "more money" must be read in conjunction with the phrase "than ... properly and legally payable."

Annapolis focuses, as did the circuit court, on the phrase "paid to any ... municipal agency authorized to collect the same." It is the view of Annapolis that because the code provision fixing the fee was declared unconstitutional, the municipal agency was never "authorized to collect" a fee. It is apparent to us that the authority to collect the fee referred to in Art. 81, § 215 is with respect to the statutory authority bestowed and not to the constitutional validity *vel non* of the fee itself. Annapolis had purported authority under the Annapolis City Code to collect the license fees

---

No person shall operate a single rental dwelling unit, multiple dwelling, bed and breakfast home or rooming house unless he holds a current, unrevoked operating license issued by the city clerk, ... under certain conditions set out in subsections (a), (b), (c), (d), (e), (g), and (h) upon payment of an amount fixed by subsection (f).

In *Campbell v. City of Annapolis, supra,* there was no reason "for us to decide whether the fee imposed by § 12–16(f) of the Annapolis City Code is primarily revenue-raising or is primarily for a regulatory purpose." 289 Md. at 305, 424 A.2d at 741.

4. We are not in accord with Annapolis' suggestion that license fees are not within the scope of the language "other fees or charges." Like the word "any" in conjunction with "any special taxes," "other" is an "uncompromising" word to be considered broadly. *See Latrobe Brewing Co. v. Comptroller of the Treasury, supra,* 232 Md. at 70, 192 A.2d at 104.

and they were paid, as required by the Code, to Annapolis. Reference to "agency authorized to collect" appears in clause one of the first sentence of § 215. The second sentence twice refers to "such agency," despite the fact that the second sentence applies to all three clauses. The second sentence applies to payments made "erroneously or mistakenly," to payments of taxes "illegally assessed or collected," and to penalties and interest "collected without authority." Similar usage of the words "agency authorized to collect the same" and "such agency" in §§ 216 through 218 indicates that these words are not used to limit claims but, rather, to identify the agency to which the claim is to be submitted.

Annapolis also presents the view, espoused by the circuit court, that if the first clause of § 215 provides Owners with entitlement to file a claim for a refund, then the refunds authorized by the second clause would be encompassed by the first clause so that "the second clause would be rendered surplusage." This, Annapolis emphasizes, would violate "[a] cardinal rule of statutory construction ...." We do not agree that the second clause is superfluous. The purpose of the second clause is to contrast the operation of § 215 with the different rule for refunds of ordinary taxes established in §§ 213 and 214. A brief historical review clarifies our reading.

In the general revision of Art. 81 effected by Ch. 226 of the Acts of 1929, refunds were treated in §§ 152 and 153, both of which dealt with persons who had "erroneously or mistakenly paid ...." Section 152 related to "State taxes" and § 153 to "taxes or other charges" paid to a county or the City of Baltimore. These sections made no distinction between ordinary and special taxes. In 1933 *Mayor of Baltimore v. Home Credit Co.*, 165 Md. 57, 166 A. 604, *on motion for reargument,* 165 Md. 69, 69, 167 A. 552, 552, involving the valuation of intangibles for ordinary taxation, decided that the remedies by way of appeal of an assessment were cumulative to refund and not exclusive. The taxpayer could obtain a refund of taxes paid on nontaxable

intangibles which the taxpayer had included in its report to the assessor. In 1934 this Court held that a taxpayer could assert the unconstitutionality of imposing ordinary taxes on his out-of-state intangible property in resisting a tax collection suit and that the defense had not been lost by failure to raise it on appeal from the assessment. *Mayor of Baltimore v. Gibbs*, 166 Md. 364, 367–68, 171 A. 37, 38, *cert. denied*, 293 U.S. 559, 55 S.Ct. 71, 79 L.Ed. 660 (1934).

Then Ch. 407 of the Acts of 1935 added "other charges" to § 152, as a subject of refunds which could be obtained from the state. Chapter 407 also added in § 153 a proviso applicable to both refund sections which was "apparently intended to overcome, to the extent specified, the *Gibbs* and *Home Credit* cases, *supra.*" *Wasena Housing Corp. v. Levay*, 188 Md. 383, 391, 52 A.2d 903, 907 (1947). That amendment to § 153 read:

[P]rovided, however, that no refund under the provisions of this or the preceding section of this sub-title shall be required in any case where the validity of the assessment upon which such taxes were levied might have been challenged by way of appeal therefrom under any of the provisions of this Article.

The General Assembly restructured the "Refund of Taxes" subtitle of Art. 81 into its present basic format by Ch. 701 of the Acts of 1941. In outline form the 1941 subtitle contained

—a section authorizing certain refunds of state ordinary taxes (now § 213);

—a section authorizing certain refunds of county and municipal ordinary taxes (now § 214);

—a section authorizing certain refunds of state special taxes or other fees and charges (later enlarged to embrace counties and municipalities and now § 215);

—a section on the procedure for applying for refunds, applicable at least to special taxes or other fees and charges (now § 216);

—a section on appeals from the initial agency action taken under the preceding section (now § 217);

—a section on the general mechanics of paying from public monies refunds "of special taxes, fees, charges, penalties or interest" (now § 218); and

—a section on the effect of other unpaid taxes owed by the taxpayer (now § 219).

Significant for present purposes is the fact that the substance of the 1935 proviso concerning appeals from assessments was expressly continued only in the two sections (§§ 161 and 162 of Ch. 701) dealing with ordinary taxes. Their successors, §§ 213 and 214, still include the following part of the 1941 enactment:

No refund shall be made ... in any case where it appears that the assessment upon which such taxes were levied and collected has become final and has not been modified on appeal as provided in this article, and the only basis for the refund is a claim that such assessment was erroneous or excessive ....

■ Sections 213 and 214, like their 1941 predecessors, operate "[w]henever any person shall claim to have erroneously or mistakenly paid ... more money ... than was properly and legally chargeable to or collectible from such person ...." In this respect clause one of present § 215 is similar. It applies "[w]henever any person shall have erroneously or mistakenly paid ... more money ... than was properly and legally payable ...." But the authorization for refunds in cases involving ordinary taxes differs from that for refunds in cases involving special taxes and other fees and charges. Clause two tells us that claims for refund under § 215 are not subject to disallowance because the overpayment of special taxes results from error in an unchallenged assessment. Clause two makes plain that the limitation under §§ 213 and 214 on refund of money "erroneously or mistakenly paid" is not a limitation under § 215 on the refund of money "erroneously or mistakenly paid." Consequently clause two is not to be read as limiting the

scope of clause one under which Owners' claims literally fall. We hold that under Art. 81, § 215 Owners were entitled to file claims for refund of the license fees they had paid Annapolis.

Next, we examine the status of the emergency legislation and its impact on the refund claims. The Maryland Tax Court saw no need to address whether the emergency legislation was constitutional, saying:

> This law was passed after the applications for refunds had already been made. If the claims for refund had come after [the emergency legislation] was enacted, a different situation may exist, but this Court is not deciding that at this time and indeed does not have to under the circumstances here existing.

The circuit court, in reversing the Tax Court, could find no basis in § 215 for granting the refunds and did not reach the constitutional issue. On this appeal, however, Owners vigorously dispute the validity of the emergency legislation.[5] Although the question was not decided in either of the lower courts, it was presented to each of them. The question is pertinent to a final resolution of this appeal. We shall exercise our discretion under Maryland Rule 885 and answer it.

The chronology of events leading to the appeals by Owners to the Maryland Tax Court is as follows:

March 31, 1978—August 15, 1980: license fees were paid by Owners to Annapolis as required by ACC § 12–16.

January 16, 1981: this Court held that the license fee provision of the Annapolis City Code, § 12–16(f), was invalid as offending the Maryland Constitution.

March 16–20, 1981: pursuant to Art. 81, § 215, claims were filed by Owners for refunds of the fees paid.

---

5. In this Court Annapolis does not address the question of the constitutionality of the emergency legislation. Like the circuit court, but contrary to our view, Annapolis stands on the position that § 215 of Art. 81 does not apply. On the improper premise that there was no authority for the refunds, Annapolis posits that the order of the Tax Court was arbitrary and capricious.

May 19, 1981: emergency legislation was passed, effective on May 19, 1981, to cure the constitutional infirmity of § 12–16(f).

June 24, 1981: Annapolis refused to approve the claims and the refunds were disallowed.

As we have seen, the emergency legislation, Chs. 565 and 684 of the Acts of 1981, by the provisions of § 1 sought to remedy the constitutional deficiency in ACC § 12–16(f) by giving Annapolis the express authority to charge a rental dwelling license fee, an authority which we had found in *Campbell, supra,* to be lacking. Section 2 of the legislation, in its first clause, clearly indicates the intention to have the authority bestowed by § 1 apply retrospectively:

AND BE IT FURTHER ENACTED, That this Act confirms and codifies authority heretofor thought to exist
. . . .

The intendment of the retrospective application of § 1 is confirmed by what follows in the second clause of § 2:

[I]n no instance may a municipal corporation be required to refund any tax or fee, collected prior to the effective date of this Act, which would be valid under the terms of this Act.

Thus, the General Assembly attempted by the emergency legislation to authorize not only the collection of rental dwelling fees in the future, but also to validate the collection of such fees which had been collected in the past. The issue in this refund case is whether the emergency legislation as applied to the license fees past paid by Owners can pass constitutional scrutiny.

We believe that *Forbes Pioneer Boat Line v. Board of Comm'rs,* 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647 (1922) is dispositive of the issue. Mr. Justice Holmes, who delivered the opinion of the Court, set out the facts, *id.* at 338–39, 42 S.Ct. at 325, 66 L.Ed. at 648:

This is a suit, begun in 1917, to recover tolls unlawfully collected from the plaintiff, the plaintiff in error, for passage through the lock of a canal. The Supreme Court

of Florida sustained the declaration, 77 Fla. 742, but on the day of the decision the Legislature passed an act, c. 7865, Acts of 1919, that purported to validate the collection. The act was pleaded. The plaintiff. demurred setting up Article I, § 10, and the Fourteenth Amendment of the Constitution of the United States, but the Supreme Court rendered judgment for the defendant on the ground that the plea was good. 80 Fla. 252.

The question in *Forbes* and the question in the case at hand are identical—

whether a state legislature can take away from a private party a right to recover money that is due when the act is passed. [258 U.S. at 339, 42 S.Ct. at 325, 66 L.Ed. at 648.]

The Court observed that "[t]he argument that prevailed below was based on the supposed analogy of *United States v. Heinszen & Co.*, 206 U.S. 370, 27 S.Ct. 742, 51 L.Ed.2d 1098 (1907), ... which held that Congress could ratify the collection of a tax that had been made without authority of law." 258 U.S. at 339, 42 S.Ct. at 325, 66 L.Ed. at 648. The Court explained why the analogy fails:

A tax may be imposed in respect of past benefits, so that if instead of calling it a ratification Congress had purported to impose the tax for the first time the enactment would have been within its power .... But generally ratification of an act is not good if attempted at a time when the ratifying authority could not lawfully do the act .... If we apply that principle this statute is invalid. For if the Legislature of Florida had attempted to make the plaintiff pay in 1919 for passages through the lock of a canal, that took place before 1917, without any promise ·of reward, there is nothing in the case as it stands to indicate that it could have done so any more effectively than it could have made a man pay a baker for a gratuitous deposit of rolls. [*Id.* at 339, 42 S.Ct. at 325, 66 L.Ed. at 648-49 (citations omitted).]

The Court went on to acknowledge that the doctrine of ratification has been carried somewhat beyond the point it indicated, stating that

[i]t is true that the doctrine of ratification has been carried somewhat beyond the point that we indicate, in regard to acts done in the name of the Government by those who assume to represent it .... It is true also that when rights are asserted on the ground of some slight technical defect or contrary to some strongly prevailing view of justice, Courts have allowed them to be defeated by subsequent legislation and have used various circumlocutions [in various cases]. In those cases it is suggested that the meaning simply is that constitutional principles must leave some play to the joints of the machine.

But Courts can not go very far against the literal meaning and plain intent of a constitutional text. [*Id.* at 339–40, 42 S.Ct. at 325–26, 66 L.Ed. at 649 (citations omitted).]

The Court reversed the judgment on this note:

Defendant owed the plaintiff a definite sum of money that it had extorted from the plaintiff without right. It is hard to find any ground for saying that the promise of the law that the public force shall be at the plaintiff's disposal is less absolute than it is when the claim is for goods sold. Yet no one would say that a claim for goods sold could be abolished without compensation. It would seem from the first decision of the Court below that the transaction was not one for which payment naturally could have been expected. To say that the legislature simply was establishing the situation as both parties knew from the beginning it ought to be would be putting something of a gloss upon the facts. We must assume that the plaintiff went through the canal relying upon its legal rights and it is not to be deprived of them because the Legislature forgot. [*Id.* at 340, 42 S.Ct. at 326, 66 L.Ed. at 649.]

When the facts and circumstances of the case before us are viewed in the light of the teachings of *Forbes,* applying the emergency legislation to the payments of the license

fees by Owners cannot be upheld under the federal and state constitutional provisions protecting property rights. *See Washington Nat'l Arena v. Prince George's County,* 287 Md. 38, 45 n. 3, 410 A.2d 1060, 1064 n. 3, *cert. denied,* 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980), and cases therein cited. We explicated and applied *Forbes* in *Nat'l Arena.*[6]

Further the retrospective application of the emergency legislation to the license fees paid here does not pass constitutional muster as permissible "curative" legislation. *Washington Nat'l Arena v. Prince George's County, supra,* is dispositive in this regard. *Nat'l Arena* was but one of a series of cases involving recordation tax provisions that generally enabled counties to set the rate, but that, for Prince George's County, fixed the rate at $1.10 per $500. Prince George's County, however, established a rate of $1.65 per $500. We had before us Ch. 129 of the Acts of 1976, which, *inter alia,* "purportedly 'ratified, confirmed, and validated' the 'authority to collect recordation taxes pursuant to a tax rate fixed' by resolution or ordinance of a subdivision on or after July 1, 1968." 287 Md. at 42, 410 A.2d at 1062. Chapter 129 became effective after the claimants had filed their claims for a partial refund of the taxes paid (the difference between the $1.10 and the $1.65 rate), but before the Maryland Tax Court disallowed the refunds. The Tax Court "viewed Ch. 129 as 'a curative act' which 'resurrected the [1968] resolution ... fixing the recordation tax rate at $1.65 per $500.00' " and which, thus, "could be retroactively applied to petitioners without impairing constitutional rights." *Id.* at 44, 410 A.2d at 1063. We stated that "[i]t is often said that 'curative acts,' although

---

**6.** Annapolis suggests that the Maryland Tax Court was constrained to follow § 2 of the emergency legislation because it took effect while the matter of the refunds was still in litigation. It cites *Janda v. General Motors Corp.,* 237 Md. 161, 205 A.2d 228 (1964). But in *Janda* we set out several rules on the retrospective application of statutes, including the concomitant restriction that "[a] statute, even if the Legislature so intended, will not be applied retrospectively to divest or adversely affect vested rights ...." *Id.* at 169, 205 A.2d at 232.

retroactive, are generally upheld on the ground that whatever a legislative body 'may authorize in prospect, it may adopt and validate in retrospect, *so long as there is no interference with vested rights or contractual obligations.*' (Emphasis supplied.)" *Id.* at 45, 410 A.2d at 1064 (quoting *Dryfoos v. Hostetter,* 268 Md. 396, 404, 302 A.2d 28, 32–33 (1973) and citing *Prince George's County Council v. Carl M. Freeman Assoc.,* 281 Md. 70, 79, 376 A.2d 860, 865 (1977)). We concluded, however, that Ch. 129 was violative of constitutionally protected rights. In reaching this conclusion, we relied on the "distinction … [citing cases], between ratifying defects in authority unrelated to the underlying policy and attempting retroactively to change legislative policy under the guise of 'curative acts'." *Nat'l Arena,* 287 Md. at 51, 410 A.2d at 1068. *See Comptroller of the Treasury v. Glenn L. Martin Co.,* 216 Md. 235, 140 A.2d 288, *cert. denied,* 358 U.S. 820, 79 S.Ct. 34, 3 L.Ed.2d 62 (1958).

As set forth earlier in this opinion, we concluded in *Campbell v. City of Annapolis, supra,* that the failure of the General Assembly to enact general enabling legislation had evinced a legislative policy that municipal corporations were not to impose, *inter alia,* a rental dwelling license fee. Thus, to the extent that Chs. 565 and 684 of the Acts of 1981 would prohibit recovery of the license fees paid under an unconstitutional ordinance, the emergency legislation must be viewed as "attempting retroactively to change legislative policy under the guise of 'curative acts'." *Nat'l Arena,* 287 Md. at 51, 410 A.2d at 1068. This, as *Nat'l Arena* held, is not permissible. The declaration of the Legislature in the first clause of § 2 of the Acts—"[t]hat this Act confirms and codifies authority heretofor thought to exist"—is of no significance in this connection. That the Legislature couched the language in "curative" terms and recited, in effect, that its intent had always been the same,

does not convert a retroactive policy change into a permissible ratification statute. The presence of "curative" language, or a recital that the Legislature in the past

really intended what is now being enacted into law, cannot render a statute immune from constitutional challenge on retroactivity grounds. If it did, any retroactive legislation could be shielded from a successful constitutional attack merely by the insertion of such language. [*Id.* at 54, 410 A.2d at 1069 (footnote omitted).]

■ We hold that, to the extent that Chs. 565 and 684 of the Acts of 1981 are applied retrospectively to authorize imposition of the rental dwelling license fees paid by Owners in 1978–1980, the legislation is invalid as impairing property rights in violation of the Fourteenth Amendment to the United States Constitution and of Article 24 of the Maryland Declaration of Rights. That is, the emergency legislation is unconstitutional as applied in this case. The Maryland Tax Court was correct in its holding that "the refund claims should have been honored and paid," and the Circuit Court for Anne Arundel County erred in reversing the judgment.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTION TO AFFIRM THE JUDGMENT OF THE MARYLAND TAX COURT. COSTS TO BE PAID BY MAYOR AND ALDERMEN OF THE CITY OF ANNAPOLIS.