650 A.2d 712

**WATERS LANDING LIMITED PARTNERSHIP et al.**

v.

**MONTGOMERY COUNTY, Maryland.**

No. 24, Sept. Term, 1994.

Court of Appeals of Maryland.

Dec. 16, 1994.

16

Robert G. Brewer, Jr. (Harry W. Lerch, Mark S. Antonvich, Lerch, Early & Brewer, on brief), Stephen W. Swartz, Bethesda (Morton Gottlieb, Rockville, C. Robert Dalrymple, Todd D. Brown, Linowes & Blocher, Silver Spring, on brief), for petitioners.

H. Christopher Malone, Sr. Asst. County Atty. (Joyce R. Stern, County Atty., Susan Berg Klein, Asst. County Atty., on brief) Rockville, for respondent.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge of the Court of Appeals (retired), Specially Assigned.

MURPHY, Chief Judge.

This case primarily concerns whether Montgomery County may impose development impact taxes retroactively to encompass charges earlier levied as development impact "fees." In our consideration of this issue, we must decide whether the General Assembly of Maryland authorized Montgomery County to impose a development impact tax under Chapter 808 of the Acts of 1963 or Chapter 707 of the Acts of 1990. Further,

we must decide whether the development impact tax imposed by the County is valid under the equal protection principles contained in the state and federal constitutions.

## I

Counties, being subdivisions of the State, cannot impose taxes on their own authority; rather they have authority to tax only if it is specifically granted to them by the State. *Controller v. Pleasure Cove*, 334 Md. 450, 463, 639 A.2d 685 (1994); *Eastern Diversified v. Montgomery Cty.*, 319 Md. 45, 49, 570 A.2d 850 (1990). Montgomery County is a charter county, and therefore derives much of its power from the Express Powers Act, codified as Maryland Code (1957, 1990 Repl.Vol.) Art. 25A, § 5. This Act grants, among other powers, a broad governing power, the so called police power— § 5(S)—and a power to levy and collect property taxes— § 5(O). After a county becomes a charter county, the General Assembly cannot enact public local laws "on any subject covered by the express powers granted...." Maryland Constitution, Art. XI–A, § 4. The General Assembly, however, may enact public local laws granting further powers to a single charter county, in addition to the express powers contained in Article 25A.

Chapter 808 of the Acts of 1963 granted to Montgomery County, with designated exceptions, "the power to tax to the same extent as the state has or could exercise said power within the limits of the county as a part of its general taxing power...."[1] By Chapter 707 of the Acts of 1990, the Legislature enacted another public local law for Montgomery Coun-

---

1. Chapter 808 excepted the following taxes from Montgomery County's taxing authority: tax on alcoholic beverages, intangible personal property tax, gasoline tax, motor vehicle registration and tax, titling tax, income tax, tax on horse racing and pari-mutuel betting, bonus tax, tax on franchise to be a corporation, tax on recording corporate papers, tax on deposits of savings banks, tax on insurance premiums, inheritance and estate tax, tax on commissions of executors and administrators, state tobacco tax, sales tax and gross receipt tax on advertising, and any other tax prohibited to a local subdivision by a statewide law.

ty for the purpose of "clarifying and confirming the authority of Montgomery County to impose and provide for the collection of development impact taxes...." This enactment specifically named development impact taxes in the grant of general taxing power to Montgomery County.[2]

## II

On April 22, 1986, the Montgomery County Council enacted bill 17–86, codified as Montgomery County Code, chapter 49A, §§ 49A–1 through 49A–14; it imposed a development impact fee on construction in two areas within the County (Germantown and Eastern Montgomery County). These two areas were designated because the development within them had reached or exceeded a threshold set by the County.[3] The amount of the fee was based on the type of unit (residential or non-residential) and either the number of dwelling units (if residential) or the gross floor area (if non-residential) in the proposed development. The ordinance required the County to impose the fee before issuing a building permit. Fees collected from a fee area were to be segregated and "restricted in

---

**2.** As repealed and reenacted by Chapter 707, with new language indicated by all capital letters, § 52–17(a) of the Public Local Laws of Montgomery County provides:

"The County Council for Montgomery County is hereby empowered and authorized to have and exercise, within the limits of the county, in addition to any and all taxing powers heretofore granted by the General Assembly, the power to tax to the same extent as the state has or could exercise said power within the limits of the county as a part of its general taxing power, WHICH INCLUDES THE POWER TO IMPOSE AND PROVIDE FOR THE COLLECTION OF DEVELOPMENT IMPACT TAXES FOR FINANCING, IN WHOLE OR IN PART, THE CAPITAL COSTS OF ADDITIONAL OR EXPANDED PUBLIC *TRANSPORTATION* FACILITIES REQUIRED TO ACCOMMODATE NEW CONSTRUCTION OR DEVELOPMENT; and to provide by resolution for the imposition, assessment, levy and collection of any tax or taxes authorized by this section; and from time to time to grant exemptions and to modify or repeal existing or future exemptions."

**3.** The ordinance permitted the County Council to decide whether to add additional impact fee areas based on certain factors listed in § 49A–14(b) of the Montgomery County Code. A slightly reformulated list of factors is now codified at § 52–59 of the Code.

their use to funding improvements listed in the Impact Fee Area Transportation Program for such area." Montgomery County Code, Ch. 49A, § 49A–4(e). The County Council stated that, in imposing the impact fees, it was "exercising its home rule powers, including its *police power* to ensure and coordinate the provision of adequate transportation facilities with new development so that the public health, safety, and welfare are enhanced, traffic congestion is lessened, accessibility is improved, and economic development is promoted." *Id.* § 49A–3(b) (emphasis added).

In order to develop their property, petitioners Morton Gottlieb (Gottlieb), Milton Company and Milton Knightsbridge Limited Partnership (Milton), and Bellemead Development Corporation (Bellemead) paid these impact fees between March, 1988, and February, 1990. Also within this period, petitioner Waters Landing Limited Partnership (Waters Landing) had its building permit approved, but did not pay the fees at that time.

On March 7, 1990, in *Eastern Diversified,* we found the development impact "fee" to be "a tax which Montgomery County is without authority to enact. . . ." 319 Md. at 55, 570 A.2d 850. Thereafter, on April 27, 1990, the Montgomery County Council, by emergency bill 33–90 (codified as Montgomery County Code, Ch. 52, §§ 52–47 through 52–59), reenacted the development impact fee as a development impact tax, changing the word "fee" to "tax" wherever it appeared. The reenactment stated that the tax was authorized by the County's "taxing power." *Id.* § 3.[4] Further, the emergency bill purported to legalize and ratify the imposition of charges

---

4. At the time the Council enacted the Development Impact Tax, it knew of the pendency of what later became Chapter 707, which would firmly establish the intention of the General Assembly to grant Montgomery County the power to impose development impact taxes. To deal with the possibility that Chapter 808 might be found to be a defective source of authority for the tax, the Council included a provision, which would, as an alternative to Chapter 808, base the authority on Chapter 707 and delay the effective date of the bill until June 1, 1990, the scheduled effective date of Chapter 707. Chapter 707 was signed on May 29, 1990, and became effective on June 1, 1990.

previously imposed as development impact fees, the imposition of which this Court, in *Eastern Diversified,* held was unauthorized. *Id.*

After emergency bill 33–90 became effective, Gottlieb, Milton, and Bellemead each requested a refund of the fees they had paid. The requests were denied and the three petitioners appealed to the Maryland Tax Court.

Waters Landing, on July 26, 1990, received a notification from Montgomery County that it owed development impact taxes on the development project that had been approved in January 1990. On August 2, Waters Landing appealed the imposition of this tax to the Maryland Tax Court. On August 17, it gave a letter of credit as security for the taxes in dispute, and, on August 21, it received building permit documents.

The tax court consolidated the four cases. It held that Chapter 808 gave the County the authority to impose the development impact tax as an excise tax, and that *Eastern Diversified* did not affect this authority. It further held, however, that emergency bill 33–90, effective April 27, 1990, could not validate the previous collection of fees "because the impact fee was a nullity." The tax court held that the impact tax could not be imposed retroactively because the change from a fee to a tax was a "substantial change." It therefore invalidated emergency bill 33–90 to the extent that it was intended to be retroactive. Concerning prospective application, the tax court upheld the bill, rejecting an equal protection challenge.

The County appealed to the Circuit Court for Montgomery County, which invalidated the tax in its entirety, as applied both retroactively and prospectively. The court interpreted *Eastern Diversified* to hold that Chapter 808 did not authorize the County to impose the tax, and therefore it could not levy the tax retroactively because it did not have the power in 1986 to impose it prospectively. Further, the circuit court considered the levy as a tax on intangible personal property (not an

excise tax) and also held that, even prospectively applied, the tax violated "the Maryland Constitution of equal taxation."

The County appealed to the Court of Special Appeals, which held that the impact tax, enacted by the County Council as emergency bill 33–90, was valid both prospectively and retroactively. *Montgomery County v. Waters*, 99 Md.App. 1, 635 A.2d 48 (1994). As an initial matter, the court interpreted *Eastern Diversified* as not affecting the authority granted by Chapter 808 of the Acts of 1963. Construing the impact tax as an excise tax, rather than an intangible personal property tax, the court rejected the uniform property taxation challenge raised under Article 15 of the Maryland Declaration of Rights.[5] The court also rejected an equal protection challenge. We granted certiorari to consider the important issues in this case.

### III

### A

■ We first consider whether the tax imposed by the county ordinance (emergency bill 33–90) may be imposed retroactively against the petitioners in this case. The parties have argued at length about the source of the County's authority to tax and the meaning of our decision in *Eastern Diversified*. The County argues that, in *Eastern Diversified*, we held only that the development impact "fee" was not authorized by the police power, contained in Article 25A, § 5(S). The petitioners, however, argue that we held that no source of authority exists for imposing the development impact charge, an argument that would foreclose the charge not only under the police power, but also under the § 5(O) property tax power and the Chapter 808 general taxing power. The petitioners' broad view of *Eastern Diversified* is based on the

---

5. Article 15 provides in pertinent part: "[A]ll taxes thereafter provided to be levied ... by the Counties ... for their respective purposes, *shall be uniform* within each class or subclass of land, improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy...." (Emphasis added).

following language used in the opinion: "Chapter 49A [of the Montgomery County Code] thus imposes a tax which Montgomery County is without authority to enact, and the development impact fee is therefore invalid." *Eastern Diversified, supra,* 319 Md. at 55, 570 A.2d 850. This language, however, read in the context of the entire opinion and the history of the case, cannot support such a broad holding; rather, our holding was more narrow, as the County argues.

We held in *Eastern Diversified* that, if the County seeks to impose a tax—a revenue measure, rather than a regulatory measure—it must choose to exercise its taxing power; it cannot disguise a tax as a regulatory fee. When we said that the County was "without authority to enact" the development impact "fee," we merely concluded that the police power, which the County purported to exercise under § 5(S), did not give it the power to impose a revenue measure. Our analysis ended when we decided that the fee was a tax. If we had intended the broader interpretation urged on us by the petitioners, we would have ascertained whether the fee was a property tax (under § 5(O)), an excise tax (under Chapter 808), or some other kind of tax which may have been unauthorized. Instead, we specifically declined to do so, stating: "We do not decide whether the tax in this case is an excise, a property, or another type of tax." *Eastern Diversified, supra,* 319 Md. at 55 n. 4, 570 A.2d 850. Furthermore, the validity of the fee as a valid exercise of the Chapter 808 taxing power was not raised in the trial court and thus was not properly before us in *Eastern Diversified.* Accordingly, we did not then address, or even mention, the County's taxing authority under Chapter 808, but we must do so in this case.

■ We hold that Chapter 808 authorized the Montgomery County Council to impose development impact "taxes." It authorized the County to tax to the same extent that the State could tax and did not explicitly except impact taxes from that grant of taxing power. Because we find nothing that would have prohibited the State from imposing the development

impact tax, we hold that Montgomery County has the power to impose such a tax.

■ The petitioners argue that the tax is an intangible personal property tax, which the General Assembly excepted from Chapter 808's grant of taxing power. We conclude, however, that the tax is an excise tax, rather than an intangible personal property tax (or any kind of property tax).[6] In *Weaver v. Prince George's County*, 281 Md. 349, 379 A.2d 399 (1977), we defined excise taxes and established a three part test to distinguish them from property taxes. *See also Ogrinz v. James*, 309 Md. 381, 397, 524 A.2d 77 (1987) (summarizing the three part *Weaver* test).

First, we consider the label given the tax by the legislative body. Although not determinative, the label is entitled to "considerable weight". *Id.* 281 Md. at 356, 379 A.2d 399. In this regard, emergency bill 33–90 indicates that the Montgomery County Council intended the tax to be an excise tax, and not an intangible personal property tax. The County imposed the tax under its "taxing authority", which could only refer to the authority granted in Chapter 808; accordingly, the tax could not have been intended as an intangible personal property tax. Furthermore, § 52–50(i) of the Montgomery County Code states that "[s]ection 52–18D applies to this [development impact] tax." It creates a lien on "all property, real or personal, and all rights to the property that belongs to the taxpayer" if the taxpayer fails to pay "any *excise tax* when due and payable." (Emphasis added).

Second, we evaluate the "actual operation and practical effect" of the tax. *Id.* A property tax is "a charge on the owner of property by reason of his ownership alone without regard to any use that might be made of it...." *Id.* at 357,

---

**6.** The Circuit Court held that the development impact tax violates the uniform tax requirement of Article 15 of the Maryland Declaration of Rights. This requirement, however, applies only to property taxes, and not to excise taxes. *Weaver*, 281 Md. 349, 355, 379 A.2d 399. Because we hold that the impact tax is not a property tax, it is not subject to Article 15 of the Maryland Declaration of Rights.

379 A.2d 399. In contrast, an excise tax is " 'a tax imposed upon the performance of an act, the engaging in an occupation, or the *enjoyment of a privilege.*' " *Id.* (quoting *Continental Motors Corp. v. Township of Muskegon,* 376 Mich. 170, 135 N.W.2d 908, 911 (1965)) (emphasis added in *Weaver*). In this case, the development impact tax operates as an excise tax rather than as a property tax. It is not imposed simply because the taxpayer owns the land; rather it is imposed only when the owner of land makes a particular use of the land, i.e., develops it. Concerning this issue, *Weaver* is highly instructive. In that case, Prince George's County imposed a tax on occupancy of multifamily residential units. In finding the occupancy tax to be an excise tax, we said:

> This Court has indicated that a tax on the use of property, as distinguished from a tax based on ownership exclusively, is in the nature of an excise. The privilege of using property is only one of the many incidents which make up the bundle of rights, powers, privileges and immunities, collectively regarded as property or ownership. As the Supreme Court stated in *Bromley v. McCaughn,* 280 U.S. [124, 136, 50 S.Ct. 46, 47, 74 L.Ed. 226 (1929) ], 'a tax imposed upon a particular use of property or the exercise of a single power incident to ownership, is an excise.' "

*Weaver, supra,* 281 Md. at 358–59, 379 A.2d 399.

Third, we consider "the methods used to impose [the taxes] to fix their amount." *Id.* at 358, 379 A.2d 399. We noted:

> "[W]here a tax is levied directly by the Legislature without assessment and is measured by the extent to which a privilege is exercised by a taxpayer without regard to the nature or value of his assets, it is an excise. Where, however, the tax is computed upon a valuation of the property and is assessed by assessors, and where the failure to pay the tax results in a lien against the property, it is a property tax, even though a privilege might be included in the valuation."

*Id.* The development impact tax in the case before us was imposed by the county ordinance as an excise tax, rather than

a property tax. It was levied directly by the Montgomery County Council, without assessment, on all who seek to develop land within the designated districts. It is not based on the value of the land, but rather on the extent to which the owner seeks to develop the land. Petitioners argue that because the value of development rights varies with the size and type of the development, the County actually taxes based on property value when it claims to tax based on size and type. We think this indirect connection between the value of the development and the type and size is entirely too speculative to support a holding that the impact tax is a property tax. Furthermore, the petitioners theory does not account for the fact that development rights are not taxed at all, no matter what their value, if the rights are not exercised.

The petitioners also argue that the tax is a property tax because it may create a lien on real property. As we said earlier, the lien would be created "on *all property,* real or personal, and all rights to the property that belongs to the taxpayer." Montgomery County Code, § 52–18D(b) (emphasis added). Unlike a property tax, which ordinarily results in a lien on only the property taxed, this lien is imposed on all the taxpayer's property. It is, therefore, similar to that imposed for failure to pay income, sales, and use taxes, which we have consistently held are not property taxes. *Ogrinz, supra,* 309 Md. at 398, 524 A.2d 77.

The petitioners further contend that our opinion in *Controller v. Pleasure Cove, supra,* describes a rule of statutory construction that requires us to narrowly construe Chapter 808 to not authorize the development impact tax. In that case, we observed that " '[i]n interpreting tax statutes [we] must not extend their provisions by implications beyond the clear import of the language employed and where there is doubt as to such a statute's scope, it should be construed most strongly in favor of the citizen and against the state.' " *Id.* (quoting *Fair Lanes v. Comptroller,* 239 Md. 157, 162, 210 A.2d 821 (1965)). We further noted: "When the words of a statute are left undefined by the Legislature, they 'should be construed as having [their] ordinary and commonly-accepted

meaning.' " *Id.* (quoting *Scoville Service, Inc. v. Comptroller,* 269 Md. 390, 395, 306 A.2d 534 (1973)). Applying these principles to Chapter 808, we think the statute clearly encompasses the development impact tax, and thus find no ambiguity that would necessitate a construction in favor of the petitioners.

## B

In analyzing the retroactivity of a statute or ordinance, a court must first determine if the legislative body intended the statute to be retroactive. As a general rule of construction, statutes are presumed to operate only prospectively, unless the Legislature clearly expresses an intent that the statute apply retroactively. *WSSC v. Riverdale Fire Co.,* 308 Md. 556, 560–61, 520 A.2d 1319 (1987). As we stated earlier, the Montgomery County Council clearly expressed its intention that the tax ordinance apply retroactively.

Second, a court must determine whether the legislative body, in the past (before the occurrence of the events to which the statute or ordinance is to be retroactively applied), had the power to enact the statute or ordinance. *Vytar Associates v. City of Annapolis,* 301 Md. 558, 570, 483 A.2d 1263 (1984); *Washington Nat'l Arena v. Pr. Geo's Co.,* 287 Md. 38, 48, 410 A.2d 1060 (1980), *cert. denied,* 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980); *Forbes Pioneer Boat Line v. Board of Com'rs,* 258 U.S. 338, 339, 42 S.Ct. 325, 326, 66 L.Ed. 647 (1922); *United States v. Heinszen,* 206 U.S. 370, 382, 27 S.Ct. 742, 744–45, 51 L.Ed. 1098 (1907). We conclude that because Chapter 808 has been in effect since 1963, it could have served as a valid source of authority for a development impact tax ordinance in 1986, the date back to which this tax ordinance is applied.[7]

---

7. We need not consider whether Chapter 707 may operate retroactively because we have held that Chapter 808, at all times relevant to this case, authorized Montgomery County to impose development impact taxes.

In the final part of a retroactivity analysis, a court must determine whether the retroactive application of the statute or ordinance would interfere with vested rights. An ordinance interferes with vested rights when it attempts "retroactively to change legislative policy." *Washington Nat'l, supra,* 287 Md. at 51, 410 A.2d 1060. This change-in-policy test, however, might not yield a clear answer in some cases. The court, therefore, may consider other factors, including:

> "whether the retrospective application of the statute works substantial injustice, whether the retroactive act was anticipated at the time of the transaction, the nature of the 'colorable authority' under which the governmental officials were acting, whether the defect in authority at the time of the collections was inadvertent, whether or not the 'repairs' made by the ratification statute were 'small,' etc...."

*Id.* at 51, 410 A.2d 1060. Although these factors may aid in defining permissible retroactivity, the change-in-policy test nevertheless "generally represents the limit of a Legislature's power to enact 'curative' statutes without impairing constitutionally protected rights." *Id.*

We arrived at the change-in-policy test by comparing *Forbes, supra,* 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647, with *Heinszen, supra,* 206 U.S. 370, 27 S.Ct. 742, 51 L.Ed. 1098. In *Heinszen,* the Court allowed Congress to retroactively authorize the collection of tariffs. The President, as Commander-in-Chief, had imposed, in 1898, a tariff on goods coming into the Philippine Islands, which at that time were under United States military control. In 1899, the peace treaty ending the Spanish–American War was ratified. The President then established a civil government in the Philippine Islands, which continued the tariff in force. In 1902, Congress expressly approved and continued the tariff. The Supreme Court, in a series of cases, held that the President was without authority to impose the tariff after the treaty was ratified, and, consequently, tariffs that were collected after the treaty was ratified but before Congress approved the tariff were improperly collected. In *Heinszen,* the Supreme Court held

that Congress could ratify the collection of these tariffs, stating:

> "That where an agent, without precedent authority, has exercised, in the name of a principal, a power which the principal had the capacity to bestow, the principal may ratify and affirm the unauthorized act, and thus retroactively give it validity when rights of third persons have not intervened, is so elementary as to need but statement. That the power of ratification as to matters within their authority may be exercised by Congress, state governments, or municipal corporations, is also elementary."

*Id.* at 382, 27 S.Ct. at 745.

In *Forbes,* the Supreme Court attempted to define the limit of the ratification concept. A boat company had gotten a judgment to recover tolls unlawfully collected for passage through a canal. Thereafter, the State Legislature passed an act "that purported to validate the collection." *Forbes, supra,* 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647. The Court held that the Legislature could not, by ratification, "take away from a private party a right to recover money that [was] due when the act [was] passed." *Id.* at 339, 42 S.Ct. at 325.

In *Washington Nat'l, supra,* 287 Md. at 50, 410 A.2d 1060, we found many similarities between the two cases, but found "one major area of difference." We noted that "in *Forbes,* there were legislative enactments setting forth the authority of the Commissioners which, as interpreted by the courts, the Commissioners were violating." *Id.* After examining *Heinszen,* however, we concluded that in that case "there never was an expression of legislative policy contrary to the unauthorized action of the administrative officials." *Id.*

Applying the change-in-policy test to the facts in *Washington Nat'l,* we held invalid the Legislature's attempted ratification of an unauthorized increase in recordation taxes. In that case, the Legislature had authorized Prince George's County, in 1968, to set the recordation tax rate at $1.10 for each $500.00 of consideration or secured debt. Soon thereafter, the County did so. A few months later, however, the County

adopted a resolution increasing the rate to $1.65. In a series of cases that followed, we made clear that the legal rate in Prince George's County was $1.10, not $1.65. In 1976, the Legislature passed Chapter 129, which "purportedly 'ratified, confirmed, and validated' " the authority of the County to have increased its rate to $1.65 in 1968. *Id.* at 42, 410 A.2d 1060. In *Washington Nat'l*, we concluded that Chapter 129 was a change in policy from the 1968 act setting the rate at $1.10, and that Chapter 129 unlawfully interfered with vested rights.

We next applied the change-in-policy test in *Vytar Associates v. City of Annapolis*, 301 Md. 558, 570, 483 A.2d 1263 (1984). In that case, the City of Annapolis had required the operators of certain rental dwellings to obtain licenses and pay license fees. In 1981, we held that the fee was invalid because it had not been expressly authorized by the General Assembly. The General Assembly thereafter granted unincorporated municipalities (including Annapolis) the authority to collect the fees, and purported to ratify the collection of previously imposed fees. In *Vytar*, we held that this attempted ratification represented a change in policy from "a legislative policy that municipal corporations were not to impose, *inter alia*, a rental dwelling license fee," as evidenced by the previous "failure of the General Assembly to enact general enabling legislation." *Id.* at 573, 483 A.2d 1263. Therefore, we held the ratification invalid.

The facts before us present a situation very different from those in *Washington Nat'l* and *Vytar*. The transition from the impact fee ordinance to the impact tax ordinance did not amount to a change in the county's policy; under both schemes, the policy was to collect money from those seeking to develop land and use those funds for necessary improvements in infrastructure. In fact, the County Council changed only two things in the fee/tax transformation—terminology and authority. Fee terminology was replaced with tax terminology, and the police-power recitation of authority was replaced with a taxing-power recitation of authority. Everything else remained essentially the same.[8] Therefore, we hold that the

---

8. Indeed, petitioners stated in their brief:

retroactive imposition of the development impact tax does not impair vested rights.

Petitioners' primary argument on this issue is that the change from police-power authority to taxing authority represents a substantial change in legislative policy. All ratifications, however, involve some sort of change in authority. When the agent originally acts, the action is unauthorized either because the principal had not affirmatively granted authorization or the authorization granted was somehow ineffective. Thereafter, the principal attempts to ratify the action by granting the proper authority. Accordingly, if we viewed a change in authority as an invalid change in legislative policy, the concept of ratification could never be invoked and the change-in-policy test would be unnecessary. This is certainly not the case in Maryland.

Petitioners also assert that the Court of Special Appeals did not consider the issue of vested rights. Ignoring that court's extensive discussion and application of the change-in-policy test, the petitioners argue that the court erred by not specifically discussing the "other factors" listed in *Washington Nat'l*. But nothing in that case indicates that the other factors must be considered in every case. Rather, having acknowledged that the line between vested and non-vested rights is often hard to draw, we simply listed some factors that we believed *"may* have a role" in drawing the line. *Washington Nat'l, supra,* 287 Md. at 51, 410 A.2d 1060 (emphasis added).

Although we think the change-in-policy test adequate to dispose of the vested rights issue in this case, we will nevertheless discuss the "other factors" because they support our conclusion. First, we see no substantial injustice in the retroactive imposition of this tax, which merely allows the County

---

"The County did so simply by changing the word 'fee' to 'tax' wherever it appeared in the impact fee statute, moving the statute from its own chapter of the Montgomery County Code to the taxation chapter, and making some other minor adjustments. The legislative rationale, collection procedure, and payment mechanism remained unchanged."

to keep the fees already paid by the petitioners. Second, the petitioners expected to pay this charge (as a fee if not as a tax); at the time they sought to develop their land, they knew they would be assessed a fee and planned accordingly. Third, those collecting the tax had colorable authority for doing so in the form of the development impact fee ordinance passed by the Montgomery County Council. Fourth, the County's failure to give its agents the proper legal foundation upon which to collect the fees was inadvertent. The County certainly expected that the fee ordinance would be upheld and that the fees collected under it would be validly collected. Finally, as we stated earlier, the modifications made by the county ordinance (emergency bill 33–90) were not major ones; everything remained the same except for the source of authority and some terminology. The five factors listed in *Washington Nat'l*, therefore, weigh in favor of allowing the County to retroactively impose the tax.

## IV

Petitioners also challenge the impact tax ordinance under the Equal Protection Clause of the Fourteenth Amendment and the analogous concept incorporated within Maryland's Due Process Clause, Article 24 of the Maryland Declaration of Rights. *See Murphy v. Edmonds*, 325 Md. 342, 353, 601 A.2d 102 (1992). Petitioners claim that their equal protection rights have been violated because the development impact tax is imposed on only two areas of the County and not on other areas.

In most equal protection challenges, courts apply the "rational basis" test to determine if a distinction made by the challenged law violates the equal protection clause.[9] *Murphy, supra*, 325 Md. at 355, 601 A.2d 102. Under this test, a court

---

**9.** The law challenged in this case does not make distinctions involving suspect classes or fundamental rights, and, therefore, need not survive strict scrutiny. Nor does the law make distinctions which have been subjected to "intermediate scrutiny." *See Murphy, supra*, 325 Md. at 356–60, 601 A.2d 102 (extensively reviewing the strict and intermediate scrutiny standards).

will disturb a classification only if " 'the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [governmental] actions were irrational.' " *Id.* (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 471, 111 S.Ct. 2395, 2406, 115 L.Ed.2d 410 (1991)). We have held that "[a] statutory classification reviewed under the rational basis standard enjoys a strong presumption of constitutionality and will be invalidated only if the classification is clearly arbitrary." *Id.,* 325 Md. at 356, 601 A.2d 102. We have also stated that "[t]he Supreme Court, in applying this test, has been willing to uphold the constitutionality of an enactment when 'any state of facts reasonably may be conceived to justify it.' " *Attorney General v. Waldron,* 289 Md. 683, 707, 426 A.2d 929 (1981) (quoting *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961)). The rational basis test "operates, at least in the sphere of economic regulation, 'quite apart from whether the conceivable "state of facts" (1) actually exists, (2) would convincingly justify the classification if it did exist, or (3) has ever been urged in the classification's defense by those who either promulgated it or have argued in its support.' " *Id.* (quoting L. Tribe, *American Constitutional Law* § 16–3, p. 996 (1978)). Specifically concerning tax statutes, we have said:

> "[A] tax statute need have no purpose other than the raising of revenue, and as long as the classifications made in imposing the tax are not utterly arbitrary, the tax statute meets the rational basis test for equal protection purposes. Moreover, there need not be evidence justifying the classifications; any 'imaginable factual basis' will do."

*Nordheimer v. Montgomery County,* 307 Md. 85, 102, 512 A.2d 379 (1986). *See also Lane Corp. v. Comptroller,* 228 Md. 90, 97, 178 A.2d 904 (1962) ("If on any imaginable factual basis, the state legislature had a reason to distinguish between certain transactions, and thus to tax them somewhat differently, the classification will be upheld.").

The petitioners assert that the tax impermissibly treats property owners in the impact tax districts differently from

property owners in the remainder of the County and different-
ly from property owners in other policy areas that are in
moratorium but not subject to the impact tax. Concerning the
first distinction, the petitioners point to the County's Adequate
Public Facilities Ordinance (APFO), which requires the Plan-
ning Board, before approving a subdivision, to determine that
all public facilities, including roads, will be adequate to serve
the development. Montgomery County Code, §§ 50–35(k).
The petitioners claim that it is unreasonable to impose a tax to
be used for road improvements when the Planning Board has
already determined the roads to be adequate under the
APFO. We conclude, however, that the impact tax is suffi-
ciently reasonable to meet constitutional scrutiny, even in light
of the prior determination by the Planning Board. In this
regard, we find the rationale of the Court of Special Appeals
convincing. It said:

> "In many jurisdictions, a significant amount of time, often
> decades, can elapse between when a piece of property is
> subdivided and when actual construction of land or structur-
> al improvements on the property begins. It is not only
> possible but, if an area is expanding rapidly, highly probable
> that the needs of an area for road expansion will have
> changed between the approval of a subdivision and the
> County's determination that an area is an impact district.
> We find nothing arbitrary about a tax that recognizes this."

*Waters, supra,* 99 Md.App. at 21, 635 A.2d 48.

Petitioners also cite § 50–20(c)(3) of the Montgomery Coun-
ty Code, which provides that "[a] determination of adequate
public facilities made [under the APFO] is timely and remains
valid ... [f]or twelve (12) years from the date of preliminary
plan approval for plans approved on or after July 25, 1989." [10]
The petitioners claim that this language prohibits the County,
within the twelve year window, from imposing a tax for
additional road improvements. We conclude, however, that
§ 50–20(c)(3) does not bind the County in determining wheth-

---

**10.** This section does not apply to Gottlieb, who obtained his approval
before July 25, 1989.

er to impose a development impact tax. The rational basis test is more than satisfied if the impact tax is supported by the facts existing at the time the County imposed the tax. The tax need not also be supported by a previous, and possibly outdated, determination of the Planning Board.

Petitioners further assert that it is unreasonable to require property owners in the impact tax districts to pay the impact tax used to fund road improvements when the owners already pay real property taxes which are also used to fund road improvements. Essentially, they claim the impact tax imposes a duplicative and unreasonable tax burden. We find this challenge unconvincing. We have already decided that the impact tax is not a tax on property, but rather a tax on the act of developing property. Therefore, the burden imposed by the impact tax is not duplicative of the property tax burden. Furthermore, we think the overall portion of the road improvement burden that is placed on the petitioners is sufficiently reasonable to meet the rational basis test. The County determined that no further development could occur in the impact tax districts unless the County added major road improvements beyond those programmed to be added. Because new development caused the increased demand for major road improvements, the County decided to tax development in the impact tax districts to help finance the improvements. Under this taxing scheme, those who pay the tax should receive the benefit of developing their property earlier than they otherwise could have developed it.

As mentioned above, the second distinction challenged by the petitioners is one between property owners in the two impact tax districts and property owners in other policy areas that are in moratorium, in which development was at or above the staging ceiling. Other areas in moratorium included North Bethesda, Aspen Hill, Gaithersburg East, Gaithersburg West, Damascus, Silver Spring/Takoma Park, and Bethesda CBD. The County Executive, in a memo dated October 10, 1990, gave specific reasons for not adding these policy areas as impact tax districts. We think his reasons, described below, are plainly adequate to meet rational basis scrutiny.

Regarding North Bethesda, the County Executive determined that much of the road improvement to be constructed (I–270 spurs) would serve primarily through traffic, making these improvements inappropriate for an impact tax program. He further noted that the North Bethesda Master Plan was in the process of being updated. Therefore, he concluded that the decision whether to add this area as an impact tax district should be delayed until the plan was updated. Concerning Aspen Hill, the County Executive also determined that the decision should be delayed until after the Aspen Hill Master Plan was updated. He noted that the County faced a large housing ceiling deficit and would need "to determine how to strike a balance between [the area's] buildout land use and its ultimate transportation network." Concerning Gaithersburg East, he noted that although the area was then "ceiling-deficient", the problem would be remedied by road improvement projects that were already under construction. The Gaithersburg West area was not recommended as an impact tax district at that time because the County Executive had not yet developed a "fully workable concept" to provide financing for improvements. Damascus was not recommended because traffic problems were primarily caused by through traffic, and, therefore, the County Executive determined that it would be inequitable to impose an impact tax in that area. Finally, in both Silver Spring/Takoma Park and Bethesda CBD, he rejected impact tax programs because there existed "little opportunity to add to transportation capacity," and "[a]ny new capacity would be used primarily by traffic generated from existing housing and employment, not from new development."

Petitioners also assert that it is unreasonable to continue to impose a development impact tax in Germantown because Germantown was not at or above the staging ceiling according to the 1990 Annual Growth Policy. We think, however, that the continuation of the impact tax district has a rational basis. By continuing the impact tax district until the area reaches full buildout, the County spreads the tax burden over both current and future development, both of which benefit from

the road improvements financed with the impact tax.[11] Moreover, the County did not make an isolated decision to retain Germantown as an impact tax district; rather the decision was made by the County Council, included in the impact tax legislative scheme, and will apply to all impact tax districts. Montgomery County Code, §§ 52–48(m), 52–59.

### V

Petitioners next argue that, under Article XI–A, § 4 of the Maryland Constitution, the Legislature cannot authorize the County to create taxing districts for other than property taxes. This provision of the Maryland Constitution provides that "no public local law shall be enacted by the General Assembly for [the] ... County on any subject covered by the express powers granted as above provided." The Express Powers Act, § 5(O), gives the County the power to create special taxing districts in which property taxes will be levied. Petitioners therefore argue that this section of the Express Powers Act entirely preempts the field of taxation within designated areas and prevents the State from designating other types of taxing areas within a home rule county. We reject this argument. The grant of authority to create property tax districts did not prohibit all further grants of authority to create other types of taxing districts. *See* 63 Op.Att'y Gen. 114, 119 (1978) ("[T]o the extent that the Express Powers Act does not give [a home rule county] the authority to create a special tax district having all of the powers desired, the General Assembly may, in our opinion, enact a local law giving the county such additional authority."); *Mont. Co. v. Md. Soft Drink Ass'n,* 281 Md. 116, 130, 377 A.2d 486 (1977) (rejecting a

---

11. Petitioners argue that this "full buildout" concept is unreasonable because it is vague. They assert that concept gives no indication of when "full buildout" will occur. We cannot find that the concept is unreasonable. The County Council most likely means that "full buildout" will occur when landowners stop developing their land. Such an interpretation is consistent with the County's asserted rationale of spreading the cost of road improvements to all future developers who will benefit from them.

claim that Chapter 808 violated Article XI–A, § 4, of the Maryland Constitution and holding that § 5(O) of the Express Powers Act did not preempt the field of taxation within a county). Accordingly, when the Legislature, in Chapter 808, gave Montgomery County the power to tax to the same extent as the State could tax, it gave Montgomery County the power to tax in special districts, so long as there is no impediment to the State creating such districts. Having already rejected an equal protection challenge, we see no reason why the State could not have created the special taxing districts that were created by Montgomery County.

Petitioners also claim that the development impact tax is actually a special benefit assessment that must be invalidated as not meeting the requirements imposed on a special benefit assessment. A special benefit assessment is a charge "imposed by law *on real property* to defray the expense of a local municipal improvement." *Montgomery County v. Schultze*, 302 Md. 481, 489, 489 A.2d 16 (1985) (emphasis added). Local governments impose these assessments "because the improvement for which the assessment is levied causes an enhancement of the property's value, with no pecuniary loss suffered by the property owner." *Id.* This enhancement in property value is a benefit accruing to the owner, above and beyond the benefit accruing to the public in general. *Id.* Therefore, the amount of the assessment is calculated to approximate the increase in the property's value, which is the special benefit. *Id.* If an improvement gives the property owner no special benefit, an assessment on the owner's property would violate the principles of due process and equal protection. In light of our holding that the development impact tax is an excise tax, not a property tax, we think petitioners' argument concerning special benefit assessments is inapplicable in this case. The development impact tax is not a special benefit assessment because it is not a tax "imposed by law on real property;" rather, it is an excise tax imposed when an owner seeks to develop its land. Furthermore, an attack based on the assumption that the tax is a special benefit

assessment is nothing more than a reformulated equal protection challenge, which we have rejected above.

While making their argument concerning special benefit assessments, the Petitioners cite *Dolan v. City of Tigard,* 512 U.S. ——, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). We think *Dolan,* which concerned the Fifth Amendment Takings Clause, is irrelevant to the issue of special benefit assessments and generally inapplicable to this case. While the facts in *Dolan* are somewhat similar to the facts before us, the Court, in reaching its holding, specifically relied on two distinguishing characteristics that are absent in the instant case. First, the Court mentioned that instead of making "legislative determinations classifying entire areas of the city," the City of Tigard "made an adjudicative decision to condition [the landowner's] application for a building permit on an individual parcel." *Id.* at ——, 114 S.Ct. at 2316, 129 L.Ed.2d at 316. Second, the Court noted that "the conditions imposed were not simply a limitation on the use [the landowner] might make of her own parcel, but a requirement that she deed portions of the property to the city." *Id.* In contrast, Montgomery County imposed the development impact tax by legislative enactment, not by adjudication, and furthermore, the tax does not require landowners to deed portions of their property to the County.

Furthermore, *Dolan* is inapplicable because it concerns the Takings Clause, which is not implicated in the case before us. To the extent that this tax is a regulation on the development of land, it is not a regulation that " 'goes too far' " so as to be " 'recognized as a taking.' " *Lucas v. South Carolina Coastal Council,* 505 U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798, 812 (1992) (quoting *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922)). A regulation does not "go too far" unless it either "compel[s] the property owner to suffer a physical 'invasion' of his property," or "denies all economically beneficial or productive use of land." *Id.* at ——, 112 S.Ct. at 2893, 120 L.Ed.2d at 812–13; *see also Pitsenberger v. Pitsenberger,* 287 Md. 20, 34, 410 A.2d 1052 (1980) ("To constitute a taking in the constitutional sense, so that the State must pay compensation,

the state action must deprive the owner of all beneficial use of the property."), *appeal dismissed,* 449 U.S. 807, 101 S.Ct. 52, 66 L.Ed.2d 10 (1980). Petitioners have not claimed, nor could they claim, that the impact tax has either of these two regulatory effects. Therefore, the Takings Clause being inapplicable, *Dolan* does not affect our decision.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.*